THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOHN DELFINO, Appellant.

(Submitted October 3, 1893; decided October 17. 1893.)

APPEAL from judgment of the Court of Oyer and Terminer of Kings county, entered upon a verdict rendered April 7, 1893, convicting defendant of the crime of murder in the first degree and from an order denying a motion for a new trial.

The following is the opinion in full :

" This is an appeal from a conviction of murder in the first degree at the Oyer and Terminer of Kings county, April 25, 1893, Hon. EDGAR M. CULLEN presiding.

" The defendant was indicted and tried for the killing of Caroline Gessell by shooting, on the 27th day of December, 1892, at her residence in DeGraw street, Brooklyn, which resulted in her death on the 12th of January, 1893. The record is voluminous, but no claim is made that any legal error was committed on the trial, or in any of the prior or subsequent proceedings. The only claim here made is that upon the evidence presented justice requires a new trial. It is conceded that the deceased died from a pistol shot discharged from a pistol owned by the defendant, while in his hands, on the evening of December 27, 1892. It was and is claimed by the defendant that the shooting was accidental and not deliberate and intentional, and this was the sole issue tried. The only evidence tending to establish the defense of accidental shooting was that given by the defendant in his own behalf.

" A brief reference to the evidence given in behalf of the People will show whether the verdict is justified. The defendant is an Italian, about 27 years of age, and was living at the time of the homicide, with his wife and children in rooms in Brooklyn, a few blocks distant from 467 De Graw street, where the deceased, Caroline Gessell, a young German woman about 22 years old, resided with her husband and child. The two families had known each other for some time prior to the homicide, and seem to have visited together. The defendant immediately prior to the homicide called frequently in the evening at the Gessell house. He was something of a musician and owned an accordeon. He took this with him to Gessell's and played on it there, and occasionally there was dancing. The wife of the defendant was confined about ten days before the homicide. The defendant had been in the country about 12 years. At first he was a shoeblack, afterwards a barber, and finally he dealt in birds, which he bought from Italian vessels arriving in New York. He had a friend in New York named Pegar, also an Italian, who with his wife resided in Elizabeth street. Mrs. Pegar had stood as godmother to one of the defendant's children. The families of Pegar and the defendant visited together, and through the defendant the Pegars became acquainted also with the Gessells.

" About 2 o'clock on the afternoon of Dec. 27, 1892, the defendant went to the house of Pegar and invited Pegar and his wife to go to his house in Brooklyn to see the defendant's wife and baby. Mrs. Pegar could not go, and the defendant was invited to sit down to dinner, which he did, and he remained at Pegar's house till about 5 o'clock, during which time he drank wine several times. While at the table he exhibited a pistol.

" It was claimed by the defendant on the trial, and in this his wife corroborated him, that he had owned the pistol several years and carried it for protection while on the docks engaged in his business. The pistol was examined by Pegar and other persons at the time it was exhibited at Pegar's house, and Pegar thought it was not then loaded. The defendant urged Pegar to go with him to his house in Brooklyn, although Pegar's wife could not go. He consented, and when the car

reached a point near De Graw street the defendant wanted Pegar to go with him first to the Gessell house. Pegar told him he did not want to go there, but upon being urged by the defendant he consented, the defendant saying: ' Well, we go there. We go right away there. Then we go to my house.' When they came to the house the testimony of Pegar as to what occurred before entering it and immediately thereafter is as follows:

" ' Q. He said, ' Maybe she is all alone,' is that right? A. Yes, sir. Q. Who said that to you? A. Delfino, ' She has the door locked; maybe she had the door locked.' Q. Go slowly, because we want to understand; ' Maybe she has the door locked?' A. The door locked; yes, sir. Q. Well, what else, what next was said? A. Well, I told him, ' What is the matter with you, because she has got the door locked;' and he says, ' Well, we had a little trouble last night, or the night before,' something like that, he said, ' and they don't want me to go in the house no more;' that is what he said. So, when I heard that, I didn't want to go up at all. He said, ' Well, it don't take long; maybe the husband is home.' So I went up with him, and I was in the front of the door, and he knocked on the door behind my back. Q. Describe that to the jury; how was that done? A. When we went up and I was in front, he was behind me, and he knocked on the door behind my back. Q. What did he say to you before you did that? A. Well, he says, ' You give your name, and say who you are; then she open the door for you.' So I didn't knock on the door; he knocked on the door behind my back. Q. Over your shoulder? A. Over my shoulder, knocked on the door, and she said, ' Who is there?' I said, ' Mr. Pegar.' She said, ' You are Mr. Pegar?' I said, ' Yes, sir.' Then she opened the door; she had the door locked. Q. Was the door locked inside? A. Yes, sir. Q. Bolted or locked? A. Bolted, I heard the ——. Q. When the door was opened what occurred? A. And when the door was opened, she said, ' Hello, Mr. Pegar; where is Mrs. Pegar;' she looked for my wife; she thought my wife was along; and when she seen him in the door she began to scold. Q. Did she see Delfino behind you? A. Yes, sir. Q. When she see him what did she say?

A. Well, she began to scold. She says, 'I don't want you to come in my house any more,' she says, and he began to laugh. Q. He began to laugh? A. Yes, sir. Q. What did she next say? A. Well, so she says, 'Well, come on in.' 'Well, I think I will go home,' I said. She says, 'Come on in, Mr. Pegar; my husband will be in in about five minutes; he will be back because he went to get his pay; he didn't work to-day.' So I stepped in there for five minutes. So the husband come in after that. Q. During the time he was in there, was there any talk between Mrs. Gessell and Delfino? A. No, she didn't say a word any more. By the Court: Q. Did Delfino go in with you? A. Delfino go in with me; yes, sir.'

"It was between 6 and 7 o'clock that the defendant and Pegar arrived at Gessell's. The shooting occurred between 8 and 9 o'clock. Meanwhile beer was sent for several times, and all the parties drank, there being present during the evening only Gessell and his wife, Pegar and the defendant, and a small child of the Gessells. After a time Mrs. Gessell prepared supper and Pegar and the defendant were invited to partake. The defendant declined and the evidence discloses that the hospitality extended by the Gessells that evening to the defendant was not cordial and that the defendant assumed a somewhat unfriendly attitude towards the family. During the evening, according to Pegar's testimony, the defendant took the pistol from his overcoat pocket and laid it on the table. Mr. Gessell said to him: 'You think because you have got a pistol in your pocket that you could do something, but I could catch you by the neck and throw you out of the window before you could use that pistol.' On one occasion Mrs. Gessell went for beer and on another Pegar went for it. The defendant went out with Pegar, saying he wanted to get a pipe. They both returned in a short time. After supper was through Pegar wanted to go, but proposed to treat, and Gessell, the husband of the deceased, went for the beer, Pegar insisting upon paying for it, which he did. While Gessell was gone for the beer the homicide occurred. Pegar was the only witness as to what occurred. He states that he was sitting on one side of the table and the defendant on the other and the deceased was sitting in a rocking chair near the

door; that the defendant got up, having his overcoat under his arm, and advanced till he came in front of Mrs. Gessell and said to her: 'Mrs. Gessell, what do you think, what are you going to do? Are you going to do what I told you?' She replied: 'No;' and further said: 'Don't bother me. Go to your wife and children, I ain't that kind. I am not the one you are looking for.' Thereupon Pegar heard two or three shots fired, and he got up and had a struggle with the defendant.

"The defendant soon left the house, leaving his pistol, hat and overcoat in the room. The pistol was a five-barrelled, 38-caliber 'American Bulldog,' and the shells therein were found to have been discharged. The defendant did not go to his home that night, but the next morning was found in a bed with his clothes on in a room two or three miles distant from his home, which had no furniture except a bed. He pretended to the officer who arrested him that he could not understand English, but afterwards, on being asked if he was the man who shot the woman on DeGraw street, he said: 'No, it was Pegar who shot the woman.' When arrested, his mustache, which he wore the day before, had been shaved off. The woman Gessell was found to be wounded in three places; a ball had entered the left side near the 10th rib, one had penetrated the left thigh and the back of her left hand had been furrowed by a bullet. None of the wounds were necessarily fatal, but blood poisoning supervened, of which she died. The evidence given on the part of the People justified the jury in convicting the defendant of murder in the first degree. The shots were discharged while the pistol was in his hands. His advances towards Mrs. Gessell had been repulsed. He entered the house after he had been requested not to go there again. Even if no murderous intent was then in his mind, the inference is very strong from Pegar's evidence that it was formed at least when he approached the deceased, and she for a second time, as may be inferred, declined to entertain his proposals. He doubtless was to some extent influenced by drink, but not so as to deprive him of responsibility for his actions. The defendant, as before stated, testified that the shooting was accidental. His story was

incredible and was disbelieved by the jury, and they accepted the testimony of Pegar, which was corroborated in many respects by other facts and by the conduct of the defendant.

"We perceive no reason for interfering with the verdict of the jury.

"The judgment should, therefore, be affirmed."

*M. L. Towns* and *Edward Moran* for appellant.

*James W. Ridgway, District Attorney,* for respondent.

ANDREWS, Ch. J., reads for affirmance.
All concur.
Judgment affirmed. _____